**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 21 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TYSON PETER WOODS,

    Defendant - Appellant.

No. 02-2067

(D. New Mexico)

(D.C. No. CR-01-1031-LH)

**ORDER AND JUDGMENT** *

Before **LUCERO** , **HOLLOWAY** , and **ANDERSON** , Circuit Judges.

After a jury trial, Appellant Tyson Woods was convicted of murder under the provisions of 18 U.S.C. §§ 1153, 1111, and 2; assault with a dangerous weapon with intent to do bodily harm in violation of 18 U.S.C. §§ 1153, 113(a)(3); using and brandishing a firearm in furtherance of a violent crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and being an accessory after the fact to

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

the crime of assault with intent to kill in violation of 18 U.S.C. §§ 1153 and 3. He was sentenced to a total of 252 months' imprisonment.

Woods appeals his murder conviction, arguing that the evidence presented at trial was insufficient to support the jury's verdict. [1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## BACKGROUND

At trial, the government based its case largely on the testimony of Erin Allen, Lucas Begay, and Carol Washburn, as well as Agent Smith, Criminal Investigator Deale, and medical and forensic experts who analyzed the physical evidence. Woods' defense consisted almost entirely of his own testimony, in addition to cross-examination of the government's witnesses. Viewed in the light most favorable to the jury's verdict, the testimony presented at trial established the following facts.

---

[1]Woods appeals the district court's ruling on his motion for acquittal, which addressed all four counts on which he was convicted. However, his brief and arguments before this court address only the first count of the indictment: murder. While it is not clear from his brief whether Woods intended to appeal his conviction on counts II, III and IV of the indictment as well, he has not provided any "reasoned argument as to the grounds for appeal" of his conviction on counts II, III and IV and has therefore waived his right to appeal his conviction with regard to those counts. Am. Airlines v. Christensen, 967 F.2d 410, 415 n.8 (10th Cir. 1992) (citing Fed. R. App. P. 28(a)(4)).

-2-

On the evening of April 13, 2001, Woods, Lesley Begay, Lionel Joe, and Erin Allen met together in Shiprock, New Mexico, for an evening of socializing and drinking. After procuring a large amount of alcohol they drove in Woods' car to a remote area of the Navajo Reservation called Area 7 so that they could shoot Woods' semi-automatic pistol, an AB-10 or "Tech-Nine." They were joined at Area 7 by another group, which included Woods' wife, Luann Woods, daughter, Summer Woods, sister-in-law, Luceta Begay, and two unrelated friends, Lucas Begay and Lorenzo Joe. The group drank and talked together for a couple of hours and most of them became heavily intoxicated. Also, using Woods' gun, they shot at rocks, beer cans, and trees.

After a couple of hours they decided to leave Area 7 and return to Shiprock. Lucas,[2] who was heavily intoxicated, attempted to drive his father's red, two-door Chevy Cavalier. As he began to pull onto the road, he crashed into Woods' car door causing significant damage. Woods was upset and got out of his car. He yelled at Lucas and held his gun within an inch of Lucas' head, causing him to fear for his life. Woods then shot the gun into the air. Lionel tried to calm Woods down and assisted in temporarily fixing the car door. A short time later

---

[2]Because many of the people involved in the events leading to Woods' conviction share the same last names, they will, for the most part, be referred to by their first names throughout this opinion.

Luann surreptitiously took the clip from her husband's gun and hid it in her jacket pocket. She later gave the clip to her sister, Luceta, to hide.

After the incident, everyone returned to Shiprock. Woods dropped off his wife, daughter, and sister-in-law, and joined Lesley, Lucas, Lionel, and Erin in Lucas' father's car, with Lucas as the eventual driver. Erin, who was drunk, asked to go home but Woods told her he did not want her to go. They drove around for a time and Erin again asked to go home; she was told to stay in the car. She attempted to get out but was pushed back into her seat by Lucas. Lionel, who Woods believed was romantically attracted to Erin, came to her defense, telling the others to let her get out of the car. They told Lionel to be quiet and Lucas continued driving.

Erin, who at this point was frightened, began kicking the seat and pulling Lucas' hair. Lesley responded by holding Erin down and Lucas tried to punch her. She was repeatedly told that they were going to kill her. Lionel again came to Erin's defense, telling the others to stop the car and let Erin get out. He was told that if he was going to stick up for Erin, he would suffer her fate.

Lucas eventually pulled the car over on Cudei Road in a remote section of the Navajo Reservation, and Woods got out of the car. Woods, who admitted that he was angry with Lionel, walked around to the passenger side of the car and pulled Lionel out. He then pulled his gun from his waistband and hit Lionel in

-4-

the head and face with it at least seven times. Lionel, who had no weapon, pleaded with Woods to stop hitting him and tried to run away. He attempted to climb over a barbed wire fence to escape the attacks, but Woods and Lesley pulled him to the ground. As he lay on the ground they kicked him. Lesley then stabbed Lionel more than 50 times. Lucas, who, until then, was in the driver's seat of the car, got out to check on Lionel but stopped when he heard him making a gurgling sound.

At trial, the government produced uncontroverted expert testimony which established that the cause of Lionel's death was a combination of blunt force injuries to the head and stab wounds to the head and body. The medical investigator initially concluded that the stab wounds were the cause of death, but revised that opinion when he was presented with the gun and asked if it could have caused any of Lionel's injuries. The investigator also noted that, despite the severity of his injuries, Lionel might have survived had he received prompt medical attention. However, though Woods admitted that he could have taken Lionel to the hospital had he wanted to, he and his companions left him in a drainage ditch in a remote area without transportation or the possibility of medical treatment.

After he stabbed Lionel, Lesley pulled Erin, who was praying in tongues, from the car and stabbed her repeatedly. Leaving Lionel and Erin by the side of

the road, Lesley, Lucas, and Woods got back in the car and drove away. After they had been driving a short while, Woods announced, "can't leave no witnesses," and directed Lucas to turn the car around. R. Vol. IV at 187. When they got back to the scene of the fight, Erin was standing on the side of the road trying to flag down a car to take her home. Lucas stopped the car and Woods and Lesley got out and pushed Erin into the back seat. They told her that they would take her to the hospital.

Instead, Lucas drove the car in the opposite direction, towards Teec Nos Pos. Erin again began to pray in tongues but was told to "shut up." Lucas parked in another, yet more remote, area of the reservation and Lesley pulled Erin from the car and stabbed her as Woods looked on. Erin thought that they would stop attacking her only if they thought she was dead so she held her breath and let her body go limp. Either Woods or Lesley put his hand up to her mouth, and, upon detecting no breathing, declared, "[w]e got her." Id. at 104. Woods and Lesley then got back in the car and Lucas drove back to Shiprock. As they were driving, Woods grabbed the knife Lesley had used to stab Lionel and Erin and threw it into the San Juan River.

After Woods, Lesley and Lucas left, Erin made her way to the road where she was eventually able to flag down a car. She told the driver what had happened and described where she lived. Once she got home she was taken by

ambulance to the local hospital. She was alert and able to describe how she had been injured to the E.M.T.s, nurses, and doctor. Erin eventually recovered from her injuries and was released from the hospital.

Upon their return to Shiprock, Lucas, Lesley, and Woods first went to Woods' car where Woods' cousin, Lorenzo Joe, had passed out from the night's revelry. They woke Lorenzo and told him part of what had happened. In particular, Woods told Lorenzo that because Lionel had hit him, he threw him out of the car and hit him with his gun.

Woods, Lesley and Lucas then drove to see Woods' aunt, Carol Washburn. Woods told her that he got into a fight, was hit in the head with an axe, and that he had "really fucked up this time." Id. at 272. Carol noted that Woods had a cut on his forehead and was very bloody. Woods and his companions had been at Carol's house for about five minutes when her husband awoke and told them to leave.

After Carol's husband kicked them out, they found their way to Lesley's house. While there, Woods gave his shoes to Lucas and told him to burn them. He then washed the blood off himself. He told Luceta, Lesley's sister, that he had hit Lionel in the head with the gun after Lionel hit him. He gave the gun to Luceta and told her to hide it. Woods also told Luceta that he had thrown the

knife that Lesley used to stab Lionel and Erin into the river. Luceta recalled Woods telling her that he was going to his uncle's house to hide out.

Some hours after Erin was brought to the hospital, and after he had taken a short nap, Woods drove with his mother to the Navajo Nation police station where he met with Criminal Investigator Leroy Deale. He told Deale that Lucas and Lionel had gotten into a fight and that Lesley stabbed both Lionel and Erin. He did not tell Deale that he had been involved in the fight or that he had a gun with him during the encounter.

Deale conferred with FBI Agent Mark Smith later that afternoon. After hearing what Woods had told Deale, Smith wanted to conduct a more thorough interview. He and Deale drove to Woods' home and, after informing him of his Miranda rights, asked him to recount the events of the previous night. In the course of Smith's questioning Woods admitted that he had been involved in the fight. He told Smith that Lionel hit him with his fists and charged at him. Woods said that while he was attempting to defend himself, Lesley began slashing at Lionel with his knife. According to Woods, Lionel then ran away from the car holding his side; he assumed that Lionel was able to escape into the night. He said that after slashing Lionel, Lesley pulled Erin from the car and began to stab her. Again, Woods failed to mention that he had a gun with him during the fight with Lionel.

-8-

The next day, Luceta, at the behest of her father, took the gun to the police, who found traces of blood and hair on it. It was sent to a lab for testing and the government presented evidence at trial that the blood found on the gun was Lionel Joe's. The government also produced evidence at trial that the gun was owned by, and registered to, Tyson Woods.

The day after the police recovered the gun, Smith again interviewed Woods who again claimed that he had only hit Lionel with his fists. When Smith showed him a picture of the gun and told him that the police had found blood and hair on the handle, he admitted it was his gun. However, he maintained that only Lesley had used it to strike Lionel. When Smith told him that he did not believe this story, Woods finally admitted that he hit Lionel with the gun, but claimed it was in self-defense.

At trial Woods again admitted that he had hit Lionel with the gun, but asserted that he did so only after Lionel charged him and pinned him against the car. Woods produced no evidence, other than his own testimony, to support his claim of self defense or contradict the government's witnesses' account of the attack.

## DISCUSSION

Woods' sole argument on appeal is that there was insufficient evidence to support his conviction for murder and that the district court erred in denying his motion for a judgment of acquittal. "In reviewing both the sufficiency of the evidence to support a conviction and a denial of a motion for judgment of acquittal, this court must review the record de novo to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000). However, the evidence "'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'" Id. (quoting United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999)). In reviewing sufficiency of the evidence we must not "weigh conflicting evidence or consider the credibility of the witnesses." United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001). Instead, we examine the evidence supporting the conviction and ask only whether, if believed, it would establish every element of the crime. Id.

The elements of murder under 28 U.S.C. §§ 1153 and 1111 are: (1) the unlawful killing of a human being; (2) with malice aforethought; (3) by an Indian; (4) in Indian Country; and (5) the defendant was not acting in self-defense.

The parties stipulated that Woods is an Indian and that the attacks took place in Indian Country. Woods argues that there was insufficient evidence to satisfy the other elements of the murder statute.

## A.    Unlawful killing

As to the first element, Woods challenges the evidence that he killed Lionel Joe. His challenge is threefold: first, he argues that Dr. Zumwalt, the medical investigator who testified at trial, changed his conclusions and therefore his testimony lacked credibility; second, he argues that Dr. Zumwalt did not conclude that the blunt force injuries in fact contributed to Lionel's death, only that they may have contributed to his death; and, third, he argues generally that there was no evidence that he killed Lionel.

Woods' first argument amounts to an attack on the credibility of the witness. The determination of credibility, however, was within the province of the jury. Woods' second argument is also unavailing: it is not supported by the record. Dr. Zumwalt testified that Lionel's death was "a result of a combination of blunt force injuries of the head and stab wounds of the head and chest." R. Vol. V at 412.

As to the third contention, the trial court instructed the jury that, "[w]hen the conduct of two or more persons contributes concurrently as a proximate cause

-11-

of death, the conduct of each person is a proximate cause, regardless of the extent to which each contributes to the death." R. Vol. VI at 649; see United States v. Hatatley , 130 F.3d 1399, 1405-06 (10th Cir. 1997). The record before us includes Woods' statements, both those roughly contemporary with the attacks, R. Vol. IV at 247, 256, 272, R. Vol. V at 366-67, and his admission at trial, R. Vol. VI at 550, that he struck Lionel with the gun; testimony by Lucas, a co-conspirator, that Woods' repeatedly struck Lionel with the gun, R. Vol. IV at 183; and DNA evidence linking Woods' gun to the attack. R. Vol. V at 473-74, 479. The expert medical investigator who testified at trial opined that the blows from the gun were contributing causes of Lionel's death. Id. at 412. On the basis of this evidence, a jury could find beyond a reasonable doubt that Woods struck Lionel and that the damage he inflicted was a contributing cause of Lionel's death.

### B.    Malice aforethought

Woods' challenge to the second element of the crime is that there was no evidence of malice aforethought. He argues that there was no evidence presented at trial that would suggest that he bore Lionel any ill will; indeed, he claims they were lifelong friends. Further, he argues that his actions – he claimed that he removed the clip from the gun, something he would not have done if he planned

to kill Lionel – were inconsistent with having formed an intent to kill. These arguments misconceive the malice aforethought element of second degree murder.

The malice aforethought requirement can be satisfied by showing: "(1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of certain felonies." Wood, 207 F.3d at 1228 (quotation and citation omitted). Malice aforethought may also be proved "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." Id. (quotation omitted).

The record included evidence that Woods or one of his companions threatened Lionel's life. R. Vol. IV at 95. Following this threat, Woods dragged Lionel from the car, id. at 95, 126 and 257, and repeatedly hit him in the head and face with a heavy pistol. Id. at 183. The physical evidence demonstrated that Lionel was struck by the gun at least seven times and with sufficient force to knock out his teeth, R. Vol. V at 429, break his jaw, id. at 430, and fracture his skull. Id. at 444-45. This evidence was sufficient to support the jury's conclusion that Woods intended to kill, or do serious bodily injury to, Lionel, or that his conduct evidenced a depraved heart.

-13-

## C.    Self-defense

Finally, Woods argues that the evidence proved he acted in self-defense, and evidence to the contrary was inadequate to support the jury's verdict. Self-defense is an affirmative defense to the charge of murder. Once a defendant makes a self-defense claim, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense.      See United States v. Smegal   , 772 F.2d 659, 660 (1985).

The record includes evidence that Woods or one of his companions threatened to kill Lionel, R. Vol. IV at 95, that Woods dragged Lionel from the car, id. at 95, 126 and 257, that Woods hit Lionel while he was pleading for mercy, id. at 182, and that Woods and Lesley chased after Lionel when he attempted to run away.    Id. at 183. The physical evidence also indicated that Lionel's wounds were primarily defensive, suggesting that he was not the aggressor. R. Vol. V at 426-28.

The only evidence that Woods did act in self defense came from Woods himself. The jury, however, had no duty to believe Woods' account of the attacks; they were free to disbelieve his testimony altogether. Indeed, the evidence of Woods' numerous, inconsistent versions of the events leading up to and including the fight cast doubt on his trial testimony. In short, a jury could conclude on the basis of the evidence presented at trial that the government

-14-

proved beyond a reasonable doubt that Woods did not act in self-defense when he killed Lionel Joe.

### D.    Other arguments

Woods makes much of the fact that all of the parties, and particularly the government's witnesses, were drunk at the time of the attacks, and thus could not possibly remember what had taken place.  He also notes that the attacks occurred at four in the morning, when it was dark outside, and therefore the government's witnesses could not have seen what went on.  Finally, he points to the fact that Lucas' testimony was "purchased," and thus tainted, by a promise by the United States Attorney's office to request a reduced sentence in his case.

All of these arguments highlight potential problems with the credibility of the government's witnesses.  However, in a sufficiency of the evidence challenge we may not consider credibility: we ask only whether the evidence presented to the jury, if believed, would be sufficient to support the verdict.  None of these arguments addresses this question, and therefore they do not affect our evaluation of the sufficiency of the evidence.

As noted above, there is sufficient evidence in the record to support the jury's finding that all elements of the murder charge were proved beyond a reasonable doubt.

**CONCLUSION**

For the foregoing reasons, the judgment of conviction is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge