**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**July 15, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 20-6154<br>(D.C. No. 5:19-CR-00273-G-1)<br>(W.D. Okla.) |
| SAANTYYA ALEXANDER, | |
| Defendant - Appellant. | |

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **EBEL**, and **EID**, Circuit Judges.
_____

Defendant-Appellant Saantyya Alexander pled guilty to felon in possession of a firearm, possession of methamphetamine with intent to distribute, and possession of a firearm in furtherance of a drug-trafficking crime. Due to a prior conviction, Alexander faced a mandatory minimum sentence of twenty-five years to run consecutively to any sentence imposed for the first two charges. The district court sentenced Alexander to thirty years in prison. Alexander appeals, requesting reversal of the district court's application of various sentencing enhancements. We affirm the district court on all issues.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.

On July 29, 2019, the Oklahoma City Police Department received 911 calls from two people related to a shooting allegedly caused by Alexander. At 7:52 a.m., a man named Colby Hurst called 911 screaming in pain that he had been shot and asking for urgent medical attention. Hurst repeatedly asked the dispatcher to hurry and send an ambulance. Hurst also relayed that he was lying down in the street, that the suspect "left on foot," and specifically urged the dispatcher to "send somebody before I die." Supp. R. Vol. I, Ex. 1 at 8:55. After less than two minutes, Hurst yelled, "I can't talk!" *Id.* at 9:35. Hurst then gave up the phone to a bystander, who immediately reiterated the request for an ambulance. As Hurst screamed, the bystander repeated the request for help. The bystander then exclaimed, "Oh my God! Oh my God! Oh God, Jesus!" *Id.* at 10:35.

Around the same time, at 7:53 a.m., Alexander's girlfriend, Erica Talton, also called 911 and told the dispatcher that a man she knew, named "Ty," had just shot someone. *Id.* at 0:17; *see also id.* at 3:28 ("He goes by Ty."). Throughout the call between Talton and the dispatcher, Talton could simultaneously be heard on another phone call, speaking with Alexander. On that call, Talton asked Alexander, "Why are you threatening me?! You know I have kids!" *Id.* at 2:39. Talton told the dispatcher that Alexander was not in a car, that he was "walking." *Id.* at 2:42. Talton then began urging her kids out of bed so she could drive them to the nearest police station. *Id.* at 2:50 ("Get up and get dressed now. Now!").

2

At the scene of the shooting, police officers learned that Hurst had been shot in the upper buttocks area. Hurst was taken to the hospital in "critical condition." R. Vol. III at 12, 14. No shell casings or bullet fragments were found. At the hospital, Hurst told officers that while he was walking down the street, he heard another man arguing with someone on the phone. That man then confronted Hurst, asking, "What are you looking at?" *Id.* at 14. After exchanging words, the man pulled out a pistol and shot Hurst. At the time, Hurst also had a gun but did not return fire.

After arriving at the police station, Talton told officers that Saantyya Alexander was the man she was speaking with on the other phone call. When asked about the call where she heard a gunshot, Talton said she heard Alexander say, "What are you looking at?" before another person responded, "I have kids." *Id.* at 13. During Talton's interview at the station, Talton received another call from Alexander where he left a voicemail message saying, "I just had a shoot-out with someone" and to "come get me ASAP." *Id.*; Supp. R. Vol. I, Ex. 2. Alexander continued to make calls to Talton during the interview, one of which she answered on speakerphone and where Alexander threatened to kill Talton, stating that he did not care if it happened in front of her children.

Roughly three hours after the shooting, police officers found Alexander near the front porch of a house approximately six blocks from the shooting, and arrested him. Alexander had no connection to the house where he was found. Officers found a Taurus 9-mm pistol in Alexander's front pocket. While the gun held a 12-round

magazine, only five rounds were loaded. Officers also found an additional 32-round magazine, methamphetamine, and crack cocaine on his person.

After the officers read Alexander his rights, Alexander explained that he found the gun on the street earlier that day. Officer Jeff Reed testified that this explanation was not true because the gun found on him was reported stolen in Tulsa less than two months prior by another ex-girlfriend of Alexander. Alexander denied any involvement in the shooting.

On October 1, 2019, a grand jury issued a three-count indictment charging Alexander with felon in possession of a firearm, 18 U.S.C. § 922(g)(1) (Count One), possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1) (Count Two), and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A) (Count Three). Alexander pled guilty to the charges without a plea agreement.

Probation issued a presentence report (PSR) in preparation for sentencing. For Counts One and Two, the PSR calculated an advisory guideline range of 235–293 months' imprisonment. Count Three required a mandatory minimum sentence of 25 years to run consecutive to any sentence imposed for Counts One and Two.

The analysis of these first two counts involved a more in-depth calculation. Because Count One involved a greater offense level, the PSR ultimately found Count

One to be the controlling guideline.[1]  Under Count One, the PSR assigned a base offense level of 22 because the charged offense involved a semiautomatic firearm capable of accepting a large capacity magazine, and because Alexander had one prior felony conviction of either a crime of violence or a controlled substance offense.

The PSR then applied several enhancements.  First, since the firearm possessed by Alexander was previously reported stolen, the PSR applied a two-level increase.  Next, the PSR applied a four-level enhancement for use of the firearm in connection with another felony—assault and battery with a deadly weapon under U.S.S.G. § 2K2.1(b)(6)(B).

At this point, the total offense level would have been 28, however, the PSR substituted this offense level with a greater, cross-referenced offense level.  U.S.S.G. § 2K2.1(c) provides for a substitute offense level "[i]f the defendant . . . possessed any firearm . . . cited in the offense of conviction in connection with the . . . attempted commission of another offense," and "if the resulting offense level is greater than that determined [under § 2K2.1]."  Under U.S.S.G. § 2A2.1(a)(1), the offense of attempted murder establishes a base offense level of 33, so the PSR applied the substitute offense level.

The PSR then applied a four-level increase under § 2A2.1(b)(1) based on the conclusion that "the victim sustained permanent or life threatening bodily injury."

---

[1] Counts One and Two were grouped together for purposes of sentencing, which meant the greater offense level under one of the two counts would control the sentence for both.  *See* U.S.S.G. § 3D1.2(c).

U.S.S.G. § 2A2.1(b)(1)(A).  After a three-level downward adjustment for acceptance of responsibility, the PSR calculated the total offense level to be 34.  This offense level, combined with Alexander's criminal history category of V, resulted in the advisory guideline range of 235–293 months' (or 19.5–24.4 years') imprisonment for Counts One and Two.

In his objections to the PSR, Alexander denied "any connection to an assault and battery with a deadly weapon or connection to any action causing permanent or life-threatening bodily injury to another person."  R. Vol. II at 27.  Alexander did not specifically object to the PSR's application of the cross reference for attempted murder, and similarly did not claim that a cross reference for the crime of assault with a deadly weapon would be more appropriate.

At sentencing, the district court heard testimony from Officer Reed, the lead investigator in the case, who was present at the station for Talton's interview when Alexander attempted to call her; he also reviewed the audio of the phone calls from Hurst and Talton.  Recordings of the phone calls, including the voicemail Alexander left on Talton's phone, were also introduced into evidence.  The district court ultimately overruled Alexander's objections to the PSR.  The court found "by a preponderance of the evidence that the assault and battery with a deadly weapon . . . was committed by defendant, and it resulted in a life-threatening bodily injury."  R. Vol. III at 27.  Thus, the court sentenced Alexander using the total offense level of 34, as recommended by the PSR.

The district court sentenced Alexander to 30 years (360 months).  It applied the mandatory minimum of 25 years (300 months) under Count Three.  As to Counts One and Two, Alexander was sentenced to five years for each count (60 months) to be served concurrently, but consecutive to the 25-year term.  The court noted that five-year sentences represented downward variances from the guidelines: "I have varied downward because the 25-year sentence . . . is largely sufficient by itself to achieve the purposes of sentencing in Section 3553."  *Id.* at 31.  Alexander filed a timely notice of appeal.

## II.

"We review the factual findings underlying a district court's sentencing determination for clear error and review the underlying legal conclusions de novo." *United States v. Marrufo*, 661 F.3d 1204, 1206 (10th Cir. 2011) (citation and internal quotation marks omitted).  "Under clear error review, we view the evidence and inferences drawn therefrom in the light most favorable to the district court's determination." *United States v. Porter*, 928 F.3d 947, 962 (10th Cir. 2019).  A finding is clearly erroneous when there is a "definite and firm conclusion that a mistake has been made." *United States v. Cook*, 550 F.3d 1292, 1295 (10th Cir. 2008).

In determining the appropriate sentence to give a defendant, the district court must consider the properly calculated guideline range, the grounds for departure

7

provided in the policy statements, and the factors under 18 U.S.C. § 3553(a).[2]  *See*

*Rita v. United States*, 551 U.S. 338, 351 (2007).  "A sentence is procedurally

unreasonable if the district court incorrectly calculates or fails to calculate the

Guidelines [range] . . . , relies on clearly erroneous facts, or inadequately explains the

sentence."  *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008).  The

government bears the burden of proving any proposed sentencing enhancement by a

preponderance of the evidence.  *United States v. Flonnory*, 630 F.3d 1280, 1285–86

(10th Cir. 2011).

Alexander claims that "[t]he district court committed four separate errors in

calculating [his] advisory guideline range for Count 1."  Aplt. Br. at 9.  First, he

argues that the court erred in applying the enhancement for use of a firearm in

connection with another offense because the evidence did not support his

participation in the alleged assault.  Second, Alexander argues that the court erred in

applying the U.S.S.G. § 2K2.1(c)(1) cross reference because there was insufficient

evidence to prove that the firearm recovered from Alexander was the same firearm

used in the shooting.  Third, Alexander argues the court erred in applying the

U.S.S.G. § 2A2.1(a)(1) cross reference, for assault with intent to commit murder,

---

[2] Under federal sentencing law, district courts apply an advisory guideline
system to "avoid excessive sentencing disparities while maintaining flexibility
sufficient to individualize sentences where necessary."  *United States v. Booker*, 543
U.S. 220, 264–65 (2005).  District courts are required to properly calculate and
consider the guidelines when sentencing, even in an advisory guideline system.  *See*
18 U.S.C. § 3553(a)(4), (a)(5); *Gall v. United States*, 552 U.S. 38, 49 (2007)
("Guidelines should be the starting point and the initial benchmark.").

because the preponderance of the evidence did not show that he met the elements of the offense. Fourth, he argues the court erred in applying an enhancement for a victim sustaining permanent or life-threatening bodily injury because there was insufficient evidence to prove that level of injury. We analyze these arguments below.

### a.

Alexander argues that his "participation in the alleged assault was not supported by sufficient or reliable evidence." *Id.* at 13. The main thrust of his argument is that the district court improperly relied on Talton's hearsay statements. We disagree. In the sentencing context, district courts may consider evidence without regard to its admissibility under the Federal Rules of Evidence, but such evidence must have "'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Padilla*, 793 F. App'x 749, 755 (10th Cir. 2019) (unpublished) (quoting U.S.S.G. § 6A1.3(a)).[3] Thus, "hearsay statements may be considered at sentencing if they bear 'some minimal indicia of reliability.'" *Cook*, 550 F.3d at 1296 (quoting *United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995)).

Two cases shed light on whether the district court properly considered Talton's statements through Officer Reed's testimony. In *United States v. Fennell*, this court

---

[3] Although not precedential, we find the discussion in *Padilla* and other unpublished cases cited below to be instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

held that the unsworn testimony of the defendant's girlfriend—taken over the telephone by a probation officer—lacked "the minimal indicia of reliability required." 65 F.3d 812, 813 (10th Cir. 1995). Since the testifying officer "did not have an opportunity to observe her demeanor" during the telephone interview, the officer "therefore could not form any opinion as to her veracity." *Id.* Considering "no other evidence . . . corroborate[d] the account," and because "these statements were the only evidence indicative of a felony," the court found the enhancement improper. *Id.*

In *Cook*, this court held that hearsay statements of two victims—who gave in-person statements to police—accusing the defendant of pointing a shotgun at them, were sufficiently reliable to support a sentencing enhancement. 550 F.3d at 1297. Despite having no live testimony, the district court relied on two police reports and one officer affidavit recounting witness statements. *Id.* The court found this was different from *Fennell* because the in-person interviews allowed police to observe the witnesses' demeanor, and because the two victims, as well as the affidavit, corroborated each other. *See id.*

In this case, Talton, Alexander's girlfriend, placed a 911 call identifying Alexander as the shooter. Later at the police station, Talton was face-to-face with officers when she repeated the same story. Talton also played the officers a voicemail that Alexander had just left her, where he stated, "I need you to come ASAP; I just had a shoot-out." Supp. R. Vol. I, Ex. 2. The evidentiary impact of a voicemail given by Alexander soon after the shooting—where he admits to having

10

"had a shoot-out"—is significant corroboration.  Talton's account to police—that while on the phone with Alexander, she heard him ask, "What are you looking at?"—is further corroborated by Hurst's testimony to police that the man who shot him was talking on the phone and that, right before he was shot, the shooter asked, "What are you looking at?"  R. Vol. III at 13–14.

The circumstances of Alexander's arrest also corroborate the identification.  Roughly three hours after the shooting, police found Alexander six blocks from the shooting, standing outside a home to which he had no connection,[4] and in possession of a half-loaded handgun.  While Alexander claimed "he had found [the gun] in the street earlier that morning," the gun was "reported stolen" from "a former girlfriend of his in Tulsa on June 20th of 2019."  *Id.* at 16.

Therefore, the district court did not clearly err in finding that the evidence supported that Alexander was the shooter.  Talton's statements were sufficiently reliable because there was a large amount of corroborating evidence.

**b.**

Alexander argues that even if he did shoot Hurst, there is not sufficient evidence to show that he used the same gun he was found with later.  Aplt. Br. at 22; *see also* U.S.S.G. § 2K2.1, cmt. n.14 (requiring proof that the firearm used in connection with the other offense be the same as the firearm charged in the indictment).  Alexander relies on *United States v. Starr*, 717 F. App'x 918 (11th Cir.

---

[4] "The occupants of the house denied knowing him."  R. Vol. III at 15.

2017) (unpublished). Aplt. Br. at 23. However, *Starr* did not involve the same amount of evidence weighing against Alexander.

In *Starr*, the defendant was charged with possession of ammunition in connection with an attempted robbery at a convenience store. *Starr*, 717 F. App'x at 919. A police officer testified that the defendant Starr "produced the black handgun and pointed it at [him]," but "he did not remember Starr firing the gun." *Id.* at 920, 923. Surveillance video showed Starr holding a gun, and ammunition was found in his getaway car. *Id.* But the only thing connecting the ammunition to the incident was the officer who testified that "Starr pointed [a black gun] at him," and "ammunition was found in the car Starr used to flee." *Id.* at 924. The court held this was not enough to support the allegation that the ammunition was used in connection with the attempted murder. *Id.*

Here, a witness did not simply attest to Alexander holding a gun; Talton told police that Alexander had shot someone. And police did not merely find abandoned ammunition; police found the alleged shooter, Alexander, a few hours after the shooting, six blocks away from the location, at a random house, holding a half-loaded gun with a false story of how he found it. This evidence is sufficient to show that the court did not commit clear error when it found that the gun Alexander was holding was the same gun that he used to shoot Hurst. *See also United States v. Draper*, 24 F.3d 83, 84–86 (10th Cir. 1994) (relying on the testimony of the defendant's ex-girlfriend to find that the two charged firearms were "used . . . in connection with another felony offense" under USSG § 2K2.1(b)(5)).

12

**c.**

Alexander also argues that the district court erred in applying the four-level enhancement for a victim sustaining permanent or life-threatening injury, under U.S.S.G. § 2A2.1(b)(1)(A), "because there was insufficient evidence to establish that level of injury." Aplt. Br. at 31. The question of "whether an injury is life threatening must be viewed at the time of the injury." *United States v. Whitethorne*, 141 F.3d 1186, 1998 WL 165167, *2 (10th Cir. 1998) (unpublished table decision). Permanent or life-threatening bodily injury "involv[es] a substantial risk of death; loss of substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1 cmt. 1; *see also United States v. Tindall*, 519 F.3d 1057, 1064 (10th Cir. 2008) ("That the injury is ultimately cured does not answer whether the injury was 'life-threatening' when inflicted.").

The question here is whether the gunshot wound involved a substantial risk of death to Hurst, and accordingly, constituted a life-threatening injury. Alexander points out that "[n]o medical reports were presented, and no evidence was presented that Hurst experienced any ongoing symptoms or impairment." Aplt. Br. at 31. Alexander claims that the government needed to provide "at least some evidence of the precise nature of the injuries or evidence of ongoing impairment."[5] *Id.*

---

[5] Alexander points to two cases to support his argument, but those are not helpful to him as neither addressed the issue of whether there was a life-threatening injury. The first case involved whether pepper spray constituted *permanent* damage to the victim's eye, *United States v. Guang*, 511 F.3d 110, 124 (2d Cir. 2007), and

13

However, we do not find clear error in the district court's finding here where the type of injury and the surrounding circumstances provided a sufficient basis for the court to find a life-threatening injury. Officer Reed, the lead investigator for the case, testified that Hurst was shot in the upper-buttocks area of his body. Reed recounted the victim's 911 call where Hurst said he had been shot, pled with the dispatcher to send an ambulance "before I die," and, while screaming in pain, relayed that he was lying down in the street. Supp. R. Vol. I, Ex. 1 at 8:55. The audio of this call included a bystander, similarly pleading for an ambulance and shouting, "Oh My God! Oh My God! Oh God, Jesus!" *Id.* at 10:35. Notably, Reed also testified that when officers arrived on the scene, "[Hurst] was in critical condition at the time." R. Vol. III at 12. After considering all the evidence, the district court ultimately found, "by a preponderance of the evidence that . . . the shooting . . . was committed by defendant, and it resulted in a life-threatening bodily injury." *Id.* at 24. In fact, the court found that it "would [even] reach the same result under a clear and convincing evidence standard." *Id.* at 27.

"The analysis of a finding regarding permanent or life-threatening bodily injury is 'highly fact specific'" and "the district court is by far best-suited to assess that myriad of factors observable in hearing the evidence presented." *United States*

---

the second involved whether a victim suffered *permanent* loss or substantial impairment when he lost 3% of function in his neck and shoulder, *United States v. Edwards*, 490 F. App'x 6, 2012 WL 3016224, *2 (9th Cir. 2012) (unpublished table opinion). Both cases focused on the permanent injury part of the statute, which is not a prong that the government argued before the district court here.

*v. Williams*, 737 F. App'x 235, 238–39 (6th Cir. 2018). Here, Hurst was shot in the upper-buttocks area of his body, Hurst pled with the dispatcher to send an ambulance "before I die," and Officer Reed testified that Hurst was in critical condition at the time he was taken to the hospital. Thus, viewing the evidence and inferences in the light most favorable to the district court's determination, *Porter*, 928 F.3d at 962, we do not arrive at a definite and firm conclusion that the district court erred in finding that Hurst's injury was life-threatening.[6]

### d.

Alexander argues that the district court erred in applying the cross reference for assault with intent to commit murder (§ 2A2.1)—as opposed to assault with a deadly weapon (§ 2A2.2)—because there was not enough evidence to establish an assault with intent to commit murder. Aplt. Br. at 25. Here, Alexander did not raise this argument below and he failed to object to the cross reference for attempted murder, we review this argument for plain error.[7] *See United States v. Malone*, 937

---

[6] Given our consideration of the facts specific to this case and our deferential standard of review, we do not impose a per se rule that a gunshot wound is per se life threatening, despite the partial dissent's suggestion to the contrary. Partial Dissent at 1.

[7] Alexander claims he preserved this argument because he objected to the use of unproven allegations of assault and battery with a deadly weapon, and generally to paragraph 26 of the PSR, which does include the cross-referenced first degree murder provision. Reply Br. at 10–12. However, considering the extent of Alexander's arguments below, we do not read Alexander as bringing the cross reference for attempted murder to the court's attention or consideration. Alexander simply did not make the argument he purports to making. *See United States v. Warren*, 737 F.3d 1278, 1285 (10th Cir. 2013) ("To the extent that the district court's determination could have been clearer, [the defendant's] general and ill-defined objection to the PSR is to blame.").

F.3d 1325, 1326–27 (10th Cir. 2019). "Plain error occurs when there is (1) error, (2) that that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Torres-Duenas*, 461 F.3d 1178, 1180 (10th Cir. 2006) (internal quotation marks omitted).[8]

In order for the district court to apply the cross reference for attempted murder, the guidelines require that "the object of the offense would have constituted first degree murder under 18 U.S.C. § 1111." U.S.S.G. § 2A2.1(a)(1), cmt. 1. First degree murder requires (1) "malice aforethought" and (2) "specific intent to commit an unlawful killing." *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (citing 18 U.S.C. § 1111). Malice aforethought involves a "reckless and wanton and a gross deviation from a reasonable standard of care." *United States v. Sides*, 944 F.2d 1554, 1558 (10th Cir. 1991) (citation and internal quotation marks omitted). A killing is committed with the requisite specific intent if it is "willful, deliberate, malicious, and premeditated." *Wood*, 207 F.3d at 1228. "[S]pecific intent is properly inferred where the apparent purpose of the lethal act is to cause the victim's death." *Id.* at 1232. Premeditation can be developed during an incident and the government

---

[8] Alexander also failed to put forward any standard of review under this argument. *See* Aplt. Br. at 25–30; *see also United States v. Fisher*, 805 F.3d 982, 992 (10th Cir. 2015) (declining to review a court's findings where defendant failed to address plain error review in his opening brief). Though this argument could be waived, we still find that Alexander's evidentiary sufficiency argument here fails on the merits under our plain error review.

is not required to "show that the defendant deliberated for any particular period of time." *United States v. Treas-Wilson*, 3 F.3d 1406, 1409 (10th Cir. 1993).

Alexander claims there is "no evidence that the shooter in this case intended to kill Hurst." Aplt. Br. at 28. However, this is simply not true. The record shows that even before Alexander pulled the trigger, Hurst tried to reason with him, pleading that "he had kids." *See* R. Vol. III at 10. This did not stop Alexander from pulling the trigger. The fact that Alexander aimed a lethal weapon directly at Hurst—seemingly as Hurst tried to get away—and then pulled the trigger is significant. This sequence of events, regardless of the location where Hurst was ultimately hit, provides sufficient evidence of both malice aforethought and an intent to kill. Under the plain error standard, we infer from Alexander's actions that his purpose was to cause the victim's death. *See Wood*, 207 F.3d at 1232; *see also United States v. Caston*, 2021 WL 1187416 at *6 (6th Cir. Mar. 30, 2021) (unpublished) ("Indeed, we have upheld a district court's finding of the intent to kill based solely on the fact that the defendant shot in the victim's direction such that the bullet could have struck him.").

Alexander also claims that the district court "made no factual findings regarding the shooter's intent, and instead simply adopted the PSR's opinion that the appropriate cross reference was the guideline for attempted murder." Aplt. Br. at 28. He cites two unpublished cases to support his argument: *United States v. Harris*, 552 F. App'x 432 (6th Cir. 2014), and *Starr*, 717 F. App'x 918. We are not persuaded.

17

In *Harris*, the court held that once a defendant calls a PSR dispute to the district court's attention, "'the court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence.'" *Harris*, 552 F. App'x at 440 (quoting *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007)); *see also* Fed. R. Crim. P. 32(i)(3)(B) (requiring the district court to rule on "any disputed portion of the presentence report or other controverted matter"). Here, contrary to the defendant in *Harris*, Alexander did not dispute the element of intent before or during his sentencing hearing, and we do not impose a duty upon district courts to go beyond summarily adopting a PSR's factual findings without a specific objection or dispute.

In *Starr*, the court found it was precluded from meaningful appellate review not only because the district court failed to make explicit findings on the intent to commit murder, but because the court failed to "adopt relevant facts from the PSR" and the record was "not sufficient to support these determinations on the first-degree murder cross-reference." *Starr*, 717 F. App'x at 924–25. But here, the district court's thought process was clearly evident from the record alone. *See id.* at 925 (finding that the court's thought process was not evident from the record). Alexander aimed his pistol at Hurst and pulled the trigger. This certainly provided a plausible basis for the court to find that Alexander intended to kill Hurst. Therefore, the district court did not commit plain error in summarily adopting the report's enhancement and finding these facts fit under the attempted murder statute. Even if there was an error here, it was not clear or obvious under well-settled law. *See*

18

*United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (finding that plain error requires the error to be contrary to well-settled law).

**III.**

For the reasons stated above, we AFFIRM the district court.


Entered for the Court


Allison H. Eid
Circuit Judge

No. 20-6154, United States v. Alexander

**EBEL**, J., concurring part and dissenting in part.

Though the majority does not directly say so, the upshot of its opinion seems to be that practically any gunshot wound is self-evidently life-threatening.  I cannot agree.

I therefore dissent from the majority's finding that the government adequately proved the victim Colby Hurst's injuries to be life-threatening.[1]  In my opinion, the record provides far less than a preponderance of evidence to support this finding.  As such, I conclude that the district court clearly erred in applying the sentencing enhancement for inflicting "permanent or life-threatening bodily injury" under U.S.S.G. § 2A2.1(b)(1)(A), requiring reversal and remand for resentencing.

I think it prudent to begin with an overview of the evidence that was before the district court at the sentencing hearing, following Alexander's proper objection to the enhancement in the PSR.  First, the government presented testimony from Officer Reed, who was the "lead investigator" of the case.  R. Vol. III at 12.  He testified as to the 911 calls from Hurst and from Alexander's girlfriend Erica Talton, the content of Alexander's additional phone calls to Talton, Reed's interview with Talton at the police station, and Hurst's recounting of the shooting in an interview with a different officer at the hospital.  Reed also testified about Alexander's arrest and the gun Alexander possessed, along with Alexander's denials of any involvement in the shooting.  Notably, Reed did not himself

---

[1] I concur with the majority's conclusions that there was no clear error or no plain error in the district court's application of the other enhancements that Alexander challenges on appeal.

interview Hurst after the shooting.  Although Reed said officers at the scene found Hurst in "critical condition," id. at 15, at the hearing Reed could offer no details regarding Hurst's injury at the time of the shooting or Hurst's current medical condition.

Second, the government presented audio recordings of Colby Hurst's 911 call and Talton's 911 call, recounted in detail by the majority, as well as an audio recording of a threatening voicemail that Alexander left for Talton.  Neither Hurst nor Talton testified at the hearing.  Indeed, Hurst refused to cooperate with police beyond one interview at the hospital (with a detective other than Reed) on the day of the shooting, about which we have very little information.

That is all of the evidence.  It illuminates very little about Hurst's injury, which is the central fact underlying the § 2A2.1(b)(1)(A) enhancement.  Nonetheless, based on this record, the district court overruled Alexander's objection to the PSR's recommended enhancement for infliction of permanent or life-threatening injury.  The majority agrees with the district court, finding no clear error in the district court's reasoning based entirely on the facts that "Hurst was shot in the upper-buttocks area of his body, Hurst pled with the dispatcher to send an ambulance 'before I die,' and Officer Reed testified that Hurst was in critical condition at the time he was taken to the hospital."  Maj. Op. at 15.

In my opinion, those three facts are meaningless in showing whether Hurst's injury was life-threatening.  Though not a trivial injury, the "upper-buttocks area" does not seem to be an especially dangerous place to be shot.  The government introduced no general evidence about the damage such gunshots can inflict on the body, how often

2

gunshots to the upper buttocks result in death, or even how often a gunshot of any kind results in death. We also know nothing more about Hurst's specific gunshot injury—did the bullet merely graze him in the upper-buttocks area? Or did it fully penetrate his body? How much blood did he lose? The record is entirely unclear on these points.

Hurst's screams of pain on the 911 call and his own apparent belief that his life might be at risk immediately after the shooting also are not persuasive. Even the most painful of injuries may never be genuinely life-threatening, and Hurst's fear that he might die—expressed in less-than-ideal conditions for assessing the severity of his injury or choosing his words carefully—was not based on any sort of medical training or any particularized facts located in the record. Had Hurst cooperated with the government and testified, perhaps he could have given specific reasons why he believed his injury was so dire. But he did not.

Likewise, I accord minimal weight to Reed's testimony that Hurst was in "critical condition." Reed did not indicate that he was present when Hurst was taken to the hospital, stating only that Hurst was in critical condition when "officers arrived." R. Vol. III at 15. Reed provided no visual description of the wound or of Hurst's condition— indeed, there is no evidence that Reed himself saw the wound at any point or conducted any examination of Hurst. Reed never personally spoke with Hurst or his doctors. The record contains no medical explanation of what "critical condition" means, or how it is determined; for all we know, it could be an automatic term applied to gunshot wounds by 911 dispatchers. It is not asking too much to require the government to present some sort of proof of severe injury beyond the victim's initial cries of pain and an officer's

3

testimony—given without any personal knowledge—that the victim was in "critical condition." We have no medical records. We do not even have descriptive testimony from anyone—medically trained or not—who <u>saw</u> the wound.[2] This is not enough.

Because the evidence presented below is wholly inadequate in demonstrating whether Hurst's specific injury was life-threatening, I believe the only way to affirm the district court's decision would be to hold that a gunshot wound to the "upper-buttocks area" may be considered life-threatening <u>per se</u>, without anything more. This rule is far too broad. True, one could imagine a scenario where a shot to the buttocks would be life-threatening. But imagination is not our standard—the underlying facts must be proven by a preponderance of evidence. I am left with the "definite and firm conclusion" that the evidence here fell well short of that bar in showing that Hurst's injury was life-threatening, and so the district court clearly erred in finding that the government had met its burden. <u>United States v. Cook</u>, 550 F.3d 1292, 1295 (10th Cir. 2008).

I also note that, despite the district court's downward variance from the guidelines range it adopted for Counts One and Two, its clear error in applying the life-threatening injury enhancement was not harmless. There is no dispute that the application of the

---

[2] This extreme dearth of specific evidence distinguishes this case from the unpublished Sixth Circuit case cited with approval by the majority. <u>See</u> maj. op. at 15 (citing <u>United States v. Williams</u>, 737 F. App'x 235, 238–39 (6th Cir. 2018) (unpublished)). In <u>Williams</u>, there was affirmative evidence that the gunshots "caused irreparable muscle and nerve damage to [the victim's] right arm," resulting in permanent partial disability and pain, as well as post-traumatic stress disorder. 737 F. App'x at 236. We have no such evidence here of how Hurst was impacted by his upper-buttocks gunshot wound moving forward, and so no basis for inferring that the wound was life-threatening or caused permanent damage.

enhancement increased Alexander's guidelines offense level and therefore increased his sentencing range under the guidelines. Such an error in calculating the guidelines range—which serves as the district court's starting point for choosing a sentence—is generally enough to show harm and warrant resentencing. See Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016). While true that the district court varied significantly downward from the guidelines range here, to a sentence of only five years (sixty months) on Counts One and Two, it provided no "cogent explanation" to indicate that the too-high guidelines range did not affect its decision, which is what we require as proof of harmlessness. United States v. Pena-Hermosillo, 522 F.3d 1108, 1117 (10th Cir. 2008). Nor did the district court hint that the downward variance was a result of any doubt about the "life-threatening injury" enhancement under § 2A2.1(b)(1)(A).

Thus, the district court's clear error in applying the § 2A2.1(b)(1)(A) enhancement affected Alexander's sentence, and so I respectfully dissent from the majority's decision to affirm the sentence imposed by the district court for Counts One and Two. I would strike the § 2A2.1(b)(1)(A) enhancement and remand to the district court for resentencing.

5